UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| TENELL RHODES, SR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| GENERAL DIGITAL CORPORATION, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT AND JURY DEMAND

### PARTIES

1.     The plaintiff, Tenell Rhodes, Sr. ("Mr. Rhodes" or the "Plaintiff"), is an African
American male resident of the state of Connecticut, residing at 500 Highland Street,
Wethersfield, Connecticut 06109.  Wethersfield is in Hartford County.

2.     The defendant General Digital Corporation (the "Company" or the "Defendant")
is a domestic for-profit corporation doing business in the state of Connecticut.  The Company's
principal office is located at 8 Nutmeg Road South, South Windsor, Connecticut, 06074.

### JURISDICTION AND VENUE

3.     The court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.
§1331 because Plaintiff has brought a claim pursuant to Title VII, 42 U.S.C. §2000e *et seq.* The
court may exercise supplemental jurisdiction over the Plaintiff's state law claims. 28 U.S.C.
§1367.

4.     This court has personal jurisdiction over the Defendant because the Defendant is a
resident of the State of Connecticut.  Further, the Defendant has engaged in and transacted

business in the State of Connecticut, including by managing and/or operating a business in

Connecticut and/or employing the Plaintiff in Connecticut, and Plaintiff's causes of action stem

largely from business transactions within the State of Connecticut. Indeed, the Plaintiff was

employed by the Defendant in the State of Connecticut, was managed and reprimanded by the

Defendant in the State of Connecticut, and was terminated by the Defendant in the State of

Connecticut.

## STATEMENT OF FACTS

5.      In or around July of 1997, Mr. Rhodes was hired by the Company as a software

testing technician based in Company's South Windsor, CT facility.

6.      At all relevant times, Mr. Rhodes was a Born Again Christian ("BAC") in terms

of his religion. Mr. Rhodes' BAC faith is a creed that is distinct from simply being "Christian"

in a general sense and is likewise distinct from other creeds and sects that also call themselves

"Christian."

7.      At all relevant times, the Company employed 20 or more employees during the

preceding 12-month period.

8.      At all relevant times, Mr. Rhodes was a qualified employee and his job

performance was satisfactory.

9.      In fact, Mr. Rhodes' performance was so exemplary that he received a number of

promotions, including a promotion to Vice President of Sales and Marketing.

10.     Mr. Rhodes's job duties largely involved business development, consulting

customers on engineering services, corporate sales, and compliance duties.

11.     During Mr. Rhodes's tenure with the Company, he was the only African-

American and BAC man in an executive and/or management position.

12.     The president of the Company, and Mr. Rhodes' direct supervisor, was Bryan
Gudrian ("Mr. Gudrian").

13.     Mr. Gudrian is a Caucasian man who is not a Born Again Christian in terms of his
religion.

14.     Part of Mr. Rhodes' sales duties involved building opportunities from sales leads
and intakes. These sales leads typically consisted of information related to contract jobs and a
salesperson could follow up on the leads to try to create a working relationship with the business
offering the contract job which could eventually evolve into recurring business.

15.     In 2008, the Company hired Ken Hagland ("Mr. Hagland") to join the salesforce.

16.     Mr. Hagland is a Caucasian man who is not a Born Again Christian in terms of
his religion.

17.     After Mr. Hagland started his employment, Mr. Gudrian would often take sales
leads from Mr. Rhodes and present them to Mr. Hagland instead.

18.     In 2011, Mr. Rhodes worked on a very lucrative sales contract with SPAWAR
and submitted the paperwork to the Company for processing.

19.     Shockingly, Mr. Gudrian allowed Mr. Hagland to work on the same sales contract
with a different reseller in order to sign the deal Mr. Rhodes had closed with SPAWAR.

20.     Notably, someone manually logged into the sales system, which requires the
credentials of senior level executives, and gave credit for the order to the Caucasian Mr. Hagland
rather than the African American Mr. Rhodes.

21.     Alarmed by the Company's decision to award one of Mr. Rhodes's sales to a
Caucasian employee, Mr. Rhodes approached Mr. Gudrian.  Mr. Rhodes explained that he (Mr.

Rhodes), not the Caucasian Mr. Hagland, had arranged the terms of the sales contract and secured the client.

22.     Although he had no plausible basis to assert that the sale should be credited to Mr. Hagland, Mr. Gudrian was reluctant to assign ownership of the sales contract back to Mr. Rhodes's account.

23.     After Mr. Rhodes's brother, Brian Martin ("Mr. Martin"), another salesman at the Company, intervened to help mediate the situation, Mr. Gudrian reluctantly credited the contract back to Mr. Rhodes.

24.     Mr. Martin is an African-American man and is also a Born Again Christian in terms of his religion.

25.     Shortly after this incident, Mr. Rhodes spoke with Human Resources regarding the discriminatory treatment he (Mr. Rhodes) was being subjected to by the Company.

26.     Mr. Rhodes met with Sandra Gudrian ("Ms. Gudrian"), a Caucasian woman who is head of Human Resources at the Company and is Mr. Gudrian's sister-in-law. Ms. Gudrian is not Born Again Christian (BAC) in terms of her religion.

27.     Both Ms. Gudrian and Mr. Gudrian attended the meeting that Mr. Rhodes had arranged.

28.     During the meeting, Mr. Rhodes raised protected concerns, including concerns that Mr. Gudrian was unfairly taking leads away from the BAC, African American Mr. Rhodes and giving them to other salesmen who were either not African-American or not Born Again Christian (or both).

29.      Despite the serious nature of these concerns, Mr. Gudrian began laughing and dismissed Mr. Rhodes's concerns. Notably, both Ms. Gudian and Mr. Gudrian appeared annoyed that Mr. Rhodes had raised protected concerns.

30.      Within a week of this meeting with Ms. Gudrian and Mr. Gudrian, Mr. Rhodes was suddenly notified that his compensation scheme would be changed in a manner that appeared designed to reduce Mr. Rhodes's total compensation.

31.      Indeed, for years Mr. Rhodes had been receiving both a base salary and a commission of between 3% and 5% on every sale.

32.      Within a week of Mr. Rhodes raising protected concerns, Mr. Gudrian informed Mr. Rhodes that he (Mr. Rhodes) would henceforth only receive a 3.15% commission on sales and would receive this commission only after meeting a $2,000,000 sales quota.

33.      Although Mr. Gudrian did raise Mr. Rhodes's base salary, the reduced commissions greatly reduced Mr. Rhodes's overall compensation.

34.      Importantly, it was or should have been clear to all relevant parties that the natural effect of this altered compensation structure would result in a decrease in Mr. Rhodes's pay since Mr. Rhodes's commissions had historically far exceeded his base salary.

35.      Due to the lowered earnings potential and the close temporal proximity between the compensation shift and Mr. Rhodes's protected concerns, it is clear that this compensation shift was designed to punish Mr. Rhodes as retaliation for expressing protected concerns regarding discriminatory conduct.

36.      Further, upon information and belief, Mr. Gudrian did not restructure the compensation scheme of other Caucasian, non-BAC employees at the Company. Thus, Mr.

Rhodes was treated unfairly compared to Caucasian employees who were not BAC and/or employees who had not raised protected concerns.

37.     In late 2011, during a discussion about public school systems, Ms. Gudrian aggressively stated that she felt that there were unfair educational advantages being given to minority students (such as African American students) over white students and that she thought that minorities in the community did not deserve such advantages. Notably, as Ms. Gudrian made these remarks, she consistently stared at the African American Mr. Rhodes.

38.     In light of the fact that Ms. Gudrian was staring at Mr. Rhodes while making this clearly racially charged remark, it seemed clear that the racially charged remark was directed at Mr. Rhodes.

39.     In or around May 2016, Mr. Gudrian hired a new employee as the sales department manager, Greg Graham ("Mr. Graham"). Mr. Graham is Caucasian and is not BAC in terms of his religion.

40.     Shortly after hiring Mr. Graham, Mr. Gudrian approached Mr. Rhodes and told him that he should "take one for the team" and give many of his (Mr. Rhodes's) clients and sales leads to Mr. Graham in order to get him acclimated to the Company.

41.     Upon information and belief, Mr. Gudrian did not request that other Caucasian, non-BAC employees and/or employees who had not raised protected concerns give up business for Mr. Graham.

42.     Notably, there were a large number of non-African American, non-BAC employees, including Mr. Gudrian, in the sales department who could have also been asked to give clients and sales leads to Mr. Graham (but who were not asked to do so).

43.     Alarmed by this further discriminatory and retaliatory action, Mr. Rhodes raised

concerns that Mr. Gudrian was solely asking him (Mr. Rhodes) to give up his sales leads (which

would inevitably reduce Mr. Rhodes's earning potential) rather than asking something similar of

non-African-American and non-BAC coworkers.

44.     In or around July 2016, Mr. Rhodes went on a sales trip with Mr. Graham, Mr.

Martin and another sales associate named Ronald Campbell ("Mr. Campbell").

45.     Notably, Mr. Rhodes, Mr. Campbell, and Mr. Martin are all African-American

men who are also BAC in terms of their religion.

46.     During the sales trip, Mr. Graham repeatedly told the customer (whom Mr.

Rhodes already had a relationship with), that he (Mr. Graham) was the top sales manager of the

Company and that Mr. Campbell, Mr. Martin, and Mr. Rhodes all worked for him.

47.     Mr. Graham's consistent assertions made it clear that he did not want to be

viewed as being on an equal standing to the three African-American Born Again Christian men

accompanying him on the trip.

48.     Following Mr. Graham's presentation, Mr. Martin independently added, "This

idea was originally by [Mr. Rhodes]. This is why [Mr. Rhodes] is the senior vice president of the

company."

49.     Mr. Graham appeared red-faced and angry following this comment.

50.     On or around July 29, 2016, upon returning from the sales trip, Mr. Graham

complained to Mr. Gudrian.

51.     That same day, Mr. Gudrian emailed Mr. Rhodes and accused him of being

insubordinate.

52.    In addition, the email made numerous derogatory remarks seemingly directed at Mr. Rhodes's sincerely held religious beliefs as a BAC.

53.    For example, the email noted that Mr. Gudrian would not "tolerate [Mr. Rhodes's] conduct and pious, entitled or judgmental behavior any longer." The email further noted that Mr. Gudiran would not tolerate "sermons" from Mr. Rhodes's office.

54.    Shocked by this sudden accusation and these clearly discriminatory remarks, Mr. Rhodes honestly answered that he had not been insubordinate. Indeed, Mr. Rhodes had not said anything that could be construed as insubordinate. Mr. Rhodes further noted that he was only at the meeting because he had been asked to attend and had a prior relationship with the client.

55.    Mr. Gudrian nonetheless continued to admonish Mr. Rhodes (without any legitimate basis) for allegedly being insubordinate.

56.    In or around September 2017, a lead from an individual in the engineering department at Walt Disney World in Orlando, Florida arrived inquiring about purchasing barracuda-style monitors.

57.    Notably, Mr. Rhodes had exclusively been working with the engineering department at Walt Disney World since 2008, and, in fact, had just sold barracuda-style monitors to the department months prior.

58.    Due to this prior relationship, according to Company policy and past practice, the lead should have been assigned to Mr. Rhodes.

59.    Indeed, the typical course of business at the Company was that if a salesperson had a history of sales with a department within a large corporate client, then that sales person would handle future leads from that same department.

60.     In fact, based on this established practice, Mr. Rhodes had often been asked in the past to give leads away to Caucasian, non-BAC employees at the Company because those employees had previously made sales within those departments.

61.     Contrary to past practice and Company policy, Mr. Gudrian directed this lead to Semsettin Berhumoglu ("Mr. Berhumoglu"), a non-African American and non-BAC employee who works in sales.

62.     Alarmed by this sudden deviation from standard Company policy and practice, Mr. Rhodes contacted Mr. Gudrian and explained his pre-existing relationship with the business department of the lead, as well as how the lead's desired inventory matched past sales Mr. Rhodes had made to the same department and coworkers.

63.     Mr. Gudrian immediately responded that he wanted Mr. Berhumoglu to take the lead.

64.     In response to this unjustified action, Mr. Rhodes raised protected concerns that leads were being distributed in an unfair and seemingly discriminatory manner that favored other employees (who were non-African American and were not Born Again Christians).

65.     Indeed, on September 21, 2017, Mr. Rhodes sent an email to Mr. Gudrian and Ms. Gudrian in which he (Mr. Rhodes) talked about the potential need for him to obtain an "attorney" to represent him with regard to his discriminatory treatment by the Company and noted the potential of a "legal battle." In this email, Mr. Rhodes likewise raised further concerns about how a prior communication from Mr. Gudrian "dismisses an immeasurable amount of offenses directly impacting me alone."

66.     This communication constituted an expression of concern that was protected under applicable federal and state anti-discrimination laws.

67.     On or around September 24, 2017, just three days after Mr. Rhodes had expressed to him clearly protected concerns in writing, Mr. Gudrian emailed Mr. Rhodes and stated, "Upon further review of your escalating accusations, rhetoric and insubordination, I hereby place you on probation pending further disciplinary review and action."

68.     In addition to placing Mr. Rhodes on probation, Mr. Gudrian also instituted a clearly retaliatory suspension of Mr. Rhodes, including declaring via email "[y]ou are hereby forbidden from entering the General Digital Coproration grounds or premises (badge deactivated) pending a meeting with me, at a time and place to be determined . . . it is unlikely that we will meet before Thursday of this week."

69.     Mr. Gudrian's email also expressly noted "[t]he probation is intended . . . to ensure that the workplace is not disrupted by any further outbursts, [or] hostility. . . . [T]he Corporation will attempt to keep knowledge of your suspension within General Digital to be limited [to a] few . . . I encourage you to keep this matter private as well . . . ."

70.     As such, it is clear that Mr. Gudrian suspended Mr. Rhodes and placed him on probation in whole or in part because of Mr. Rhodes's protected concerns.

71.     On September 25, 2017, Mr. Rhodes responded to Mr. Gudrian's clearly discriminatory and retaliatory email. Mr. Rhodes email stated, "I sincerely apologize for the strong words used in expressing my concerns about my treatment by you and others at GDC over the past decade or more. Though I truly believe every claim I made is accurate, I did not mean to convey them impolitely or irreverently. I felt provoked and mistreated. I am concerned that over this period of time I have been harassed, treated differently, retaliated and discriminated against particularly because of racial and religious reasons, among other unjust reasons. I look forward

to our meeting and am hopeful for a positive resolution and continued company growth and prosperity."

72.     On or around September 28, 2017, Mr. Rhodes met with Mr. Gudrian and Ms. Gudrian. During the meeting, Mr. Rhodes again raised protected concerns, including by noting that he was being treated differently than his non-Black, non-BAC coworkers.

73.     On September 28, 2017, Mr. Rhodes emailed Mr. Gudrian and Ms. Gudrian reiterating the points Mr. Rhodes had made during the meeting, including by requesting "[f]air and equitable treatment for all. Same level of encouragement, support and scrutiny for all. No favorites or outcasts. No more harassment and excessive oversight of me, Brian, and Ron, forcing us to constantly justify our every move."

74.     Notably, Mr. Rhodes, Brian Martin, and Ron Campbell (the three employees referred to in Mr. Rhodes' September 28 email to Mr. Gudrian) are each African American and Born Again Christians. As such, Mr. Rhodes's email was requesting that the Company and Mr. Gudrian cease harassing the three African American, BAC employees in the sales department and likewise cease treating these three African American, BAC employees differently.

75.     Although the probation was only supposed to last a few weeks, the probation was seemingly made indefinite with no rational end in sight, despite there being no further alleged incidents. This constituted further improper retaliation against Mr. Rhodes.

76.     On or around October 12, 2017, a new lead for an existing client of Mr. Rhodes came into the office.

77.     Accordingly, pursuant to past Company practice and policy, the lead should have been assigned to Mr. Rhodes.

78.     Contrary to past practice and policy, Mr. Gudrian redirected this lead to Mr. Berhumoglu.

79.     In a further act of retaliation, Mr. Gudrian told Mr. Rhodes he was not to contact this lead for the purpose of acquiring future business (despite Mr. Rhodes's pre-existing relationship and sales history). Mr. Gudrian copied Ms. Gudrian on this communication as well.

80.     In response, Mr. Rhodes again raised protected concerns to both Mr. Gudrian and Ms. Gudrian, noting that he (Mr. Rhodes) felt Mr. Gudrian's directive not to go near this lead was another instance where Mr. Rhodes was being treated in a discriminatory manner based on his race and religion, since this was another lead that would normally have been assigned to him instead being improperly redirected to a non-African-American coworker who was not a Born Again Christian.

81.     Both Mr. Gudrian and Ms. Gudrian disregarded Mr. Rhodes's protected concerns and did not address them further.

82.     Although Mr. Gudrian imposed restrictions on Mr. Rhodes contacting the lead for acquiring future business, Mr. Gudrian made it clear that Mr. Rhodes was not restricted from soliciting business from the existing client at issue, SPAWAR.  Indeed, Mr. Gudrian only required that Mr. Rhodes should refrain from actively soliciting new business from the specific person that he (Mr. Gudrian) had assigned as a lead to another non-African American, non-BAC employee (Mr. Berhumoglu).

83.     In late October, as part of his job duties, Mr. Rhodes was planning a work trip to meet with corporate clients, including SPAWAR.

84.     Pursuant to Company policy, Mr. Rhodes was required to confirm in advance out of state meetings with corporate clients and, as such, Mr. Rhodes needed to contact the program manager at SPAWAR.

85.     The program manager at SPAWAR was incidentally also in charge of the lead whom Mr. Gudrian had assigned to Mr. Berhumoglu.

86.     Due to Mr. Gudrian's instructions, Mr. Rhodes was careful not to solicit any business from the program manager so as not to interfere with Mr. Berhumoglu's lead. Instead, Mr. Rhodes merely sought to arrange the details of his regularly scheduled visit to SPAWAR.

87.     Assumedly due to Mr. Rhodes's longstanding pre-existing relationship with SPAWAR, during this phone call the program manager inquired into making a purchase from the Company for the very department for which Mr. Berhumoglu's lead would have solicited a sale.

88.     When Mr. Gudrian heard Mr. Rhodes had spoken with the program manager, even though he (Mr. Rhodes) had not initiated any discussions for sales purposes and this individual was necessary to interact with for purposes of Mr. Rhodes's regularly scheduled visit, Mr. Gudrian became irate.

89.     Mr. Rhodes attempted to explain how he had fully complied with all instructions related to interactions with the lead and had not been insubordinate, but Mr. Gudrian would not listen to Mr. Rhodes.

90.     On or around November 14, 2017, during a meeting of the Company's Shareholders, Ms. Gudrian falsely alleged to the Shareholders that Mr. Rhodes had directly and deliberately violated Mr. Gudrian's order.

91.     Mr. Rhodes explained to the Shareholders that the program manager initiated a sales query while Mr. Rhodes was planning for his visit and that he (Mr. Rhodes) did not willfully violate Mr. Gudrian's directive.

92.     The Shareholders discussed the situation and after verifying Mr. Rhodes' account with the program manager, appropriately decided that Mr. Rhodes had not engaged in any misconduct and that therefore his actions did not warrant any discipline.

93.     In fact, the Shareholders allowed Mr. Rhodes to retain credit for the sale that this program manager had approached Mr. Rhodes about.

94.     Due to the clearly discriminatory and retaliatory actions of Mr. Gudrian, Mr. Rhodes raised protected concerns to the Company's Shareholders, including concerns that he (Mr. Rhodes) was being treated in a discriminatory manner by Mr. Gudrian due to his (Mr. Rhodes's) race and religious beliefs.

95.     Mr. Gudrian angrily called Mr. Rhodes's claims preposterous and Ms. Gudrian rolled her eyes before saying Mr. Rhodes had no evidence to prove that.

96.     The rest of the Shareholders did not comment on Mr. Rhodes's protected concerns.

97.     Of note, the Shareholders primarily consisted of individuals who were not African-American and were likewise not Born Again Christians.

98.     On or around January 15, 2018, Mr. Gudrian awarded credit for the Walt Disney World contract to Mr. Berhumoglu, despite the sale being from the longstanding relationship that Mr. Rhodes had cultivated with the Walt Disney World engineering team.  This resulted in a loss of compensation from Mr. Rhodes, since a substantial portion of his income consisted of commissions.

99. On January 17, 2018, Mr. Rhodes emailed Mr. Gudrian and again raised protected concerns. Indeed, the email explicitly noted that "[e]mployees have a legal right to complain about their concerns of their rights being violated. The Connecticut Commission on Human Rights and Opportunities safeguards these rights in our state, and the U.S. Equal Employment Opportunity Commission does so on a federal level." The email further noted, "At this time I am officially complaining to GDC HR that my human rights and opportunities are being violated by the practices of many at GDC."

100. Shockingly, just days later, Mr. Rhodes received a letter from the Company's Board of Directors (the "Board") dated January 19, 2018 (a mere two days after Mr. Rhodes talked in his January 17 email about filing a complaint with the Connecticut Commission on Human Rights and Opportunities and the U.S. Equal Employment Opportunity Commission) asserting that the probationary period that Mr. Gudrian had commenced (for retaliatory reasons) in September 2017 was warranted and continued to be warranted due to Mr. Rhodes's "repeated acts of insubordination."

101. The letter made several threatening remarks clearly indicating that Mr. Rhodes faced termination if he continued to raise further protected concerns.

102. In late January 2018, Ms. Gudrian once again approached Mr. Rhodes and asserted that there was no evidence of racial or religious discrimination. Based on Ms. Gudrian's tone and the manner in which she made the comment, it seemed clear that Ms. Gudrian was annoyed and angered by Mr. Rhodes's expression of protected concerns.

103. In early February 2018, Mr. Martin, Mr. Campbell and Mr. Rhodes were in Mr. Rhodes's office praying during a lunch break.

104.     Normally Mr. Martin, Mr. Rhodes, and Mr. Campbell, who were all African American and BAC, went on prayer walks for lunch every Tuesday, but as it was raining outside, they decided to meet in Mr. Rhodes' office to pray during their lunch break instead.

105.     During this prayer lunch, Ms. Gudrian walked past Mr. Rhodes' office door, stopped, looked inside through the window, and then quickly walked away.

106.     Upon information and belief, Ms. Gudrian felt uncomfortable with Mr. Rhodes's exercise of religious freedom and told Mr. Gudrian about the prayer lunch that she had witnessed.

107.     Indeed, shortly after this prayer lunch, Mr. Gudrian reprimanded Mr. Rhodes and claimed that as part of Mr. Rhodes's probation he (Mr. Rhodes) was not allowed to organize any office meetings without permission.

108.     Mr. Rhodes explained to Mr. Gudrian that it was not an office meeting, but was rather the same Tuesday prayer lunch he had been having almost every week for years during his employment with the Company.

109.     This attempt to stop Mr. Martin, Mr. Campbell and Mr. Rhodes (who, notably, were all African American and BAC) from engaging in religious freedom during their off-the-clock hours is a clear instance of religious discrimination.

110.     Notably, non-African American and/or non-BAC employees were not similarly reprimanded when they engaged in similar (non-prayer related) informal gatherings, including gatherings that took place during their lunch breaks.

111.     On or around February 20, 2018, Mr. Rhodes raised protected concerns and submitted a formal written complaint to both Ms. Gudrian and Mr. Gudrian (the "February 20

Complaint") detailing more of the racial and religious discrimination he had experienced at the Company since his employment began.

112.    Importantly, Mr. Rhodes began February 20 Complaint by noting that "I . . . am formally filing a complaint and claim of harassment, mistreatment, discrimination, threats, provocation, and retaliation due to racial and religious reasons, among other unjust reasons. I am expressing my concerns about how Bryan Gudrian (BG), . . . Sandi Cudrian (SG), and others at General Digital Corporation (GDC) have treated me and certain minorities and Born-Again Christians over the past decade or more."

113.    In the February 20 Complaint, Mr. Rhodes also noted that "[t]his is an ongoing complaint claim escalated and formalized because of the unjust and retaliatory probation and title removal, which was issued because I was standing up for my rights and claiming foul play on 09-19-201[7] and prior."

114.    Further, in the February 20 Complaint Mr. Rhodes went on to list a number of examples in which he believed the Company and/or Mr. Gudrian had unfairly and illegally favored white and/or non-BAC employees in a discriminatory manner.

115.    Despite the fact that Mr. Rhodes emailed the February 20 Complaint to Mr. Gudrian and Ms. Gudiran, they never responded to Mr. Rhodes' February 20 Complaint and seemed to dismiss his protected concerns.

116.    On or around March 1, 2018 (just over a week after the February 20 Complaint was emailed by Mr. Rhodes to Mr. Gudrian and Ms. Gudrian), Mr. Gudrian ordered Mr. Rhodes into his office.

117.    Mr. Gudrian told Mr. Rhodes that the Board of Directors had privately met and decided to terminate Mr. Rhodes's employment.

118. Notably, this was barely a week after Mr. Rhodes had submitted a complaint detailing significant instances of race-related and religious discrimination, as well as numerous instances of retaliation.

119. Furthermore, as there had been no further alleged improper conduct by Mr. Rhodes between January 19, 2018, when the Board sent Mr. Rhodes a letter reiterating that Mr. Rhodes was on probation, and March 1, 2018, apart from Mr. Rhodes's expression of protected concerns on February 20, 2018, it is clear that the termination was due, in whole or in part, to Mr. Rhodes's expression of protected concerns and/or the prayer lunch he had attended.

120. In light of the suspiciously close timing between Mr. Rhodes's February 20 protected complaints and the termination, Mr. Rhodes asked if he was being fired because of his formal February 20 complaint which detailed protected concerns about discrimination in the workplace.

121. Mr. Gudrian did not deny that this expression of protected concerns was the cause of the termination and instead simply reiterated that Mr. Rhodes was terminated. Mr. Gudrian then told Mr. Rhodes in a menacing voice that he had called the police to escort Mr. Rhodes out of the Company's facility.

122. Notably, in Mr. Rhodes's more than twenty years with the Company, the police had never been called to come to the facility when a Caucasian and/or non-BAC employee had been terminated.

123. It seems clear that the Company and Mr. Gudrian called the police to escort Mr. Rhodes out in order to embarrass, intimidate, and retaliate against Mr. Rhodes and/or due Mr. Rhodes's race, religion, and/or prior expressions of protected concerns.

124.    Utterly shocked at this circumstance, Mr. Rhodes turned to Mr. Gudrian and asked if terminating him (Mr. Rhodes) and calling the police seemed like retaliation to him (Mr. Gudrian).

125.    Mr. Gudrian simply shrugged and gave a pleased expression, and neither he nor Ms. Gudrian had any further comment.

126.    Accordingly, on or around March 1, 2018, Mr. Rhodes was involuntarily terminated from by the Company.

127.    Indeed, because of the call to the police by, or at the behest of, Mr. Gudrian, Mr Rhodes was escorted by the police off the premises where he had worked peacefully for approximately twenty (20) years.

128.    Indeed, during his entire employment with the Company, Mr. Rhodes had never been violent to anyone and had likewise never threatened violence.  Hence, calling the police was unjustified and constituted a clear attempt to harass, humiliate, and retaliate against Mr. Rhodes and to damage Mr. Rhodes's reputation.

129.    Mr. Gudrian aided and abetted in the Company's discriminatory actions, including, but not limited to, by repeatedly lobbying the Board of Directors to reprimand Mr. Rhodes and/or terminate Mr. Rhodes's employment based on the false information provided to the Board by Mr. Gudrian.

130.    The Company employed three or more persons during all relevant times.

131.    Indeed, the Company employed 15 or more employees during 20 or more calendar weeks during all relevant calendar years.

132.    On or around April 12, 2018, Mr. Rhodes timely filed a Charge of Discrimination (the "Charge") with the Connecticut Commission on Human Rights and Opportunities

("CHRO") (Charge Nos. 1840329, 1840330) and the Equal Employment Opportunity

Commission (Charge No. 16A-2018-000991).

133.    On or around August 28, 2018, Mr. Rhodes notified the CHRO of his intent to file

a complaint with Superior Court and, accordingly, requested that the CHRO release jurisdiction

and permit Mr. Rhodes to file in Superior Court.

134.    On or around November 28, 2018, the EEOC provided Mr. Rhodes with a Notice

of a Right to Sue letter.

135.    This Complaint is timely filed in compliance with the timeframes of relevant laws

and requirements.

## COUNT I
## (Discrimination Based on Race, Color, and Religious Creed in Violation of Conn. Gen. Stat. § 46a-60)
## Plaintiff v. the Defendant

136.    The Plaintiff herein incorporates the previous allegations set forth in paragraphs

1-135.

137.    The Company is an employer under the definitions applicable to Conn. Gen. Stat.

§ 46a-60 because the Company employed three or more persons.

138.    The Company, by and through its agents, including, but not limited to, Mr.

Gudrian, harassed and discriminated against Plaintiff with respect to his compensation, terms,

conditions, or privileges of employment, because of Plaintiff's race (African American), color

(black), and/or religious creed (Born-Again-Christian).

139.    More specifically, the Company subjected the Plaintiff to adverse actions,

including, but not limited to, unjustified and/or discriminatory decreases in his compensation

(including by redirecting leads that would have otherwise been assigned to Mr. Rhodes),

unjustified and/or overly harsh discipline and reprimands, the imposition of an unjustified

probationary status, suspension, and the termination of the Plaintiff's employment because of the

Plaintiff's race, color, and/or religious creed.

140.    As a direct and proximate result of the Defendant's violations of Conn. Gen. Stat.

§ 46-60, the Plaintiff has suffered and continues to suffer damages, including, but not limited to,

lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment

of life, and emotional damages.

141.    The Plaintiff seeks all damages to which he is entitled, including, but not limited

to, lost compensation and benefits (including, but not limited to, back pay and front pay),

diminished earning capacity, injury to reputation, other monetary damages, compensatory

damages (including, but not limited to, future pecuniary losses, emotional pain, suffering,

inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses),

attorneys' fees, interest, and costs.

## COUNT II
## (Discrimination Based on Race, Color, and Religious Creed in Violation of Title VII, 42 U.S.C. §§ 2000e, et seq.)
### Plaintiff v. the Defendant

142.    The Plaintiff herein incorporates the previous allegations set forth in paragraphs

1-142.

143.    During all relevant periods the Company was an employer under Title VII, 42

U.S.C. §§ 2000e, et seq. (hereinafter, "Title VII") because it was a person engaged in an industry

affecting commerce and had fifteen or more employees for each working day in each of twenty

or more calendar weeks during the relevant calendar years.

144.    The Company, by and through its agents, including, but not limited to, Mr.

Gudrian and Ms. Gudiran, harassed and discriminated against Plaintiff with respect to his

compensation, terms, conditions, or privileges of employment, because of Plaintiff's race
(African American), color (black), and/or religious creed (Born-Again-Christian).

145.    More specifically, the Company subjected the Plaintiff to adverse actions,
including, but not limited to, unjustified and/or discriminatory decreases in his compensation
(including by redirecting leads that would have otherwise been assigned to Mr. Rhodes),
unjustified and/or overly harsh discipline and reprimands, the imposition of an unjustified
probationary status, suspension, and the termination of the Plaintiff's employment because of the
Plaintiff's race, color, and/or religion.

146.    The Company acted with malice and/or with reckless indifference to the federally
protected rights of Mr. Rhodes.

147.    As a direct and proximate result of the Company's violations of Title VII, the
Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost
compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of
life, and emotional damages.

148.    The Plaintiff seeks all damages to which he is entitled, including, but not limited
to, lost compensation and benefits (including, but not limited to, back pay and front pay),
diminished earning capacity, injury to reputation, other monetary damages, compensatory
damages (including, but not limited to, future pecuniary losses, emotional pain, suffering,
inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses),
punitive damages, attorneys' fees, interest, and costs.

## COUNT III

**(Retaliation in Violation of Conn. Gen. Stat. § 46a-60)**

**Plaintiff v. the Defendant**

149.     The Plaintiff herein incorporates the previous allegations set forth in paragraphs
1-149.

150.     The Plaintiff engaged in protected activity under Conn. Gen. Stat. § 46a-60,
including, but not limited to, by voicing protected concerns regarding the harassing and
discriminatory actions improperly undertaken by the Company based on the race (African
American), color (black), and/or religion (Born-Again-Christian) of the Plaintiff and other
employees and by expressing the possibility of filing a discrimination charge with the CHRO
and/or the EEOC and/or citing the potential of taking other legal action based on discrimination
and harassment.

151.     The Defendant retaliated against the Plaintiff and/or discriminated against the
Plaintiff for opposing an act or practice made unlawful by Conn. Gen. Stat. § 46a-60 by
subjecting Mr. Rhodes to unjustified and/or discriminatory decreases in his compensation
(including by redirecting leads that would have otherwise been assigned to Mr. Rhodes),
unjustified and/or overly harsh discipline and reprimands, the imposition of an unjustified
probationary status, suspension, and the termination of the Plaintiff's employment for pretextual
reasons.

152.     As a direct and proximate result of the Defendant's violations of Conn. Gen. Stat.
§ 46-60, the Plaintiff has suffered and continues to suffer damages, including, but not limited to,
lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment
of life, and emotional damages.

153.     The Plaintiff seeks all damages to which he is entitled, including, but not limited
to, lost compensation and benefits (including, but not limited to, back pay and front pay),
diminished earning capacity, injury to reputation, other monetary damages, compensatory
damages (including, but not limited to, future pecuniary losses, emotional pain, suffering,

inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses),
attorneys' fees, interest, and costs.

## COUNT IV

### (Retaliation in Violation of Title VII, 42 U.S.C. §§ 2000e, et seq.)
### Plaintiff v. the Company

154.     The Plaintiff herein incorporates the previous allegations set forth in paragraphs
1-152.

155.     The Plaintiff engaged in protected activity under Title VII, including, but not
limited to, by voicing protected concerns regarding the harassing and discriminatory actions
improperly undertaken by the Company based on the race (African American), color (black),
and/or religion (Born-Again-Christian) of the Plaintiff and other employees and by expressing
the possibility of filing a discrimination charge with the CHRO and/or the EEOC and/or citing
the potential of taking other legal action based on discrimination and harassment.

156.     Defendant retaliated against the Plaintiff and/or discriminated against the Plaintiff
for opposing an act or practice made unlawful by Title VII by subjecting Mr. Rhodes to
unjustified and/or discriminatory decreases in his compensation (including by redirecting leads
that would have otherwise been assigned to Mr. Rhodes), unjustified and/or overly harsh
discipline and reprimands, the imposition of an unjustified probationary status, suspension, and
the termination of the Plaintiff's employment for pretextual reasons.

157.     The Company acted with malice and/or with reckless indifference to the federally
protected rights of Mr. Rhodes.

158.     As a direct and proximate result of the Company's violations of Title VII, the
Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost
compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of
life, and emotional damages.

159.     The Plaintiff seeks all damages to which he is entitled, including, but not limited

to, lost compensation and benefits (including, but not limited to, back pay and front pay),

diminished earning capacity, injury to reputation, other monetary damages, compensatory

damages (including, but not limited to, future pecuniary losses, emotional pain, suffering,

inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses),

punitive damages, attorneys' fees, interest, and costs.

> WHEREFORE, the Plaintiff, Tenell Rhodes, respectfully requests that this honorable
> court:
>
> A.  Schedule this matter for trial by jury;
>
> B.  Find the Defendants liable on all counts;
>
> C.  Award the Plaintiff his lost compensation and benefits (including, but not limited
>     to, back pay and front pay), which is in excess of fifteen thousand dollars,
>     exclusive of interest and costs;
>
> D.  Award the Plaintiff other monetary damages, including damages for his
>     diminished earning capacity and injury to reputation;
>
> E.  Award the Plaintiff compensatory damages, including, but not limited to, future
>     pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss
>     of enjoyment of life, and other nonpecuniary losses;
>
> F.  Award the Plaintiff punitive damages;
>
> G.  Award the Plaintiff his reasonable attorney's fees;
>
> H.  Award the Plaintiff interest and costs;

I.   Award the Plaintiff all other damages to which he is entitled; and

J.   Grant such further relief as is just and equitable.

Respectfully Submitted,

Tenell Rhodes, Sr.

By his attorneys,

THE LAW OFFICES OF WYATT &
ASSOCIATES P.L.L.C

Date: December 14, 2018          By:

Benjamin J. Wyatt, ct29994
BWyatt@Wyattlegalservices.com
The Law Offices of Wyatt & Associates,
P.L.L.C.
17 Elm Street, Suite C211
Keene, NH 03431
Telephone: (603) 357-1112
Facsimile: (603) 685-2868